BOUVIER–IAEGER COAL LAND CO. v. SYPHER et al.

(Circuit Court, S. D. West Virginia. December 20, 1910.)

1. ACKNOWLEDGMENT (§ 62*)—PAROL EVIDENCE AFFECTING DEEDS.

Parol evidence is admissible to show that the parties to an alleged deed did not appear before the officer purporting to have taken their acknowledgment.

[Ed. Note.—For other cases, see Acknowledgment, Cent. Dig. §§ 345–347; Dec. Dig. § 62.*]

2. DEEDS (§ 194*)—DELIVERY—PRESUMPTION FROM RECORDING AFTER DEATH OF PARTIES.

There is no presumption of the delivery of a deed, where it was not presented for record until 19 years after its date, and after the death of all the parties and the officer before whom it purported to have been acknowledged, and by some person unknown, and not shown to have any connection with the grantee.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 574–583; Dec. Dig. § 194.*]

3. DEEDS (§ 207*)—VALIDITY—EVIDENCE OF EXECUTION AND DELIVERY.

A deed, recorded in 1877, purported to have been executed in 1858 by three grantors and the wife of one, to have been acknowledged in a small town in the interior of Kentucky, 12 miles from a railroad, and to convey undivided interests in a large tract of land in Virginia. Two of the grantors had sold their interests more than 10 years before, and the land had been partitioned by agreement between their grantees, their cograntor in the deed, and other owners, one of whom was the grantee. One grantor resided in Baltimore and the others in Philadelphia, and four children of the one whose wife joined, who lived with their parents at the time, testified that their parents were not absent from home and had never been in Kentucky. Their father, who then owned two of the several tracts into which the land had been subdivided, afterward sold and conveyed one of them with the knowledge of the grantee in such deed, and paid taxes on the other until his death; 16 years later. The grantee never made any claim under the deed, nor did any of his heirs, until 40 years after his death, and it was not shown to ever have been in his possession, or that of any one representing him. It was recorded after the death of all of the parties, and of the officer before whom it purported to have been acknowledged, at the instance of some one unknown, and was never seen by any of the living parties in interest. The names of the principal grantor and his wife were both misspelled in the deed, although he was an intelligent business man. Held, that such evidence was sufficient to establish that the deed was a forgery, and to entitle an adverse claimant of a part of the land. under a conveyance from the heirs of the principal grantor named therein, to its cancellation as a cloud on his title.

[Ed. Note.—For other cases, see Deeds, Cent. Dig. §§ 614–624; Dec. Dig. § 207.*]

In Equity. Suit by the Bouvier-Iaeger Coal Land Company against Howard H. Sypher and others. Decree for complainant.

On March 4, 1795, Robert Morris obtained from the commonwealth of Virginia a patent for a tract of 320,000 acres of land then lying in the counties of Wythe and Russell, now lying mainly in McDowell and Wyoming counties, W. Va. And 19 days thereafterwards, namely, on March 23, 1795, said Robert Morris obtained another patent for another tract of 480,000 acres adjoining the tract of 320,000 above mentioned, so that by these patents, granted almost simultaneously, and, in fact, surveyed practically at the same time, Robert

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

Morris apparently acquired title to 800,000 acres of land. Adjoining these lands on the west, Robert Morris, as assignee of Wilson Cary Nicholas, on the 23d of June, 1795, obtained a patent for 500,000 acres. This is the tract involved in the litigation known as the "Henry C. King Cases" lately pending in this and other courts. As will hereafter appear, instead of there being 800,000 acres in the two patents of 320,000 and 480,000 acres to Robert Morris above mentioned, it was found upon actual survey that there were only 207,500 acres.

The record shows that on March 13, 1797, Robert Morris and wife conveyed the whole of these two tracts of land to William Cramond, and on October 28, 1814, William Cramond and wife conveyed them to Thomas Astley. Astley's heirs conveyed the two tracts to Henry Cramond December 10, 1840. The two tracts became forfeited for nonpayment of taxes prior to 1842, and in that year George W. G. Browne, commissioner of forfeited and delinquent lands for Tazewell county, Va., under decree of the court, sold the two tracts to William Cramond, and after his death conveyed them to his widow and heirs, and on November 5, 1846, the other heirs conveyed these lands to Henry Cramond. On the same date, November 5, 1846, Henry Cramond conveyed the two tracts to Charles Feinour, Jr. Up to this time the two tracts of 320,000 and 480,000 acres had been kept together, unbroken, in the same person.

On November 22, 1846, Charles Feinour, Jr., conveyed to Thomas Beck, by metes and bounds, 50,000 acres out of the 320,000-acre tract; and on March 1, 1847, Feinour and wife conveyed to John Herman the two tracts of 480,000 and 320,000 acres, excepting the Beck 50,000 acres. This is the first time that John Herman appears in connection with these lands, and, as will be seen by the agreement between him and Cameron of August 11, 1847, hereafter mentioned, whilst the conveyance to Herman was apparently in fee, yet in fact he was a mere trustee for various persons and various trusts, among others to secure to himself the payment of $40,000. On April 27, 1847, John Herman and wife conveyed 175,000 acres, undivided, of the two tracts of 320,000 and 480,000 acres, to Michael Bouvier. This is the first time that Mr. Bouvier appears in connection with these lands. This conveyance to Bouvier was also in the nature of a mortgage to secure the payment of $22,000. On July 13, 1847, Herman and wife conveyed to David S. Hollister, of Philadelphia, 150,000 acres, undivided, out of the two tracts. This deed was not recorded until November 8, 1847.

On August 11, 1847, a trust agreement was made between Herman and S. Cameron, showing the trusts on which the said Herman and S. Cameron held the legal title to these lands. On October 16, 1847, Herman and wife conveyed to Thomas Rawlings and Michael Bouvier the 750,000 acres, in trust to sell for not less than 50 cents an acre, and from the proceeds to pay to Herman and Eustache Bouvier $62,000 and to David S. Hollister $13,000. On October 18, 1847, Michael Bouvier and wife conveyed to Eustache Bouvier the 175,000 acres, which had been conveyed to Michael by Herman. Afterwards all this indebtedness was adjusted, and on April 27, 1848, Herman, Hollister, and Eustache Bouvier release Rawlings and Michael Bouvier from all former trusts, and declare that said trustees are to stand seised of said property to secure to John W. Tilford the sum of $6,000.

On July 20, 1848, Tilford assigned this indebtedness to Michael Bouvier. *On September 9, 1848; David S. Hollister and wife conveyed all his interest in these lands to Silas M. Hamilton, subject to the deed of trust to Rawlings and Bouvier.* On February 28, 1849, Hamilton and wife conveyed the Hollister interest to Edwin C. Searles, and Searles, by mortgage dated October 8, 1849, conveyed his interest to secure the payment of $25,000 to Emery H. Penniman. Oakes Terrill and William A. Bull acquired interests in these lands by conveyances which need not be set out. All the interests were undivided, and were all subject to the $6,000 lien, originally in favor of Tilford, but which had been assigned to Michael Bouvier.

In this situation, on the 7th day of December, 1850, Michael Bouvier, as the owner of the said $6,000 lien, entered into the following agreement with Oakes Terrill, Jr., Edwin C. Searles, and William A. Bull, of the city of

New York, and John Herman and Eustache Bouvier, of the city of Philadelphia:

"Agreement, made this seventh day of December, Anno Domini one thousand eight hundred and fifty, between Michael Bouvier, of the city of Philadelphia, of the first part, and Oakes Terrill, Jr., Edwin C. Searles, and William A. Bull, of the city of New York, and John Herman and Eustache Bouvier, of said city of Philadelphia, of the second part.

"Whereas, the parties of the second part are tenants in common of certain lands, situated in the counties of Tazewell and Logan, in the state of Virginia, estimated to contain in the whole seven hundred and fifty thousand acres, in the following proportions, namely: The said John Herman to seventy-seven parts, the whole into one hundred and fifty parts being divided, or equal three hundred and eighty-five thousand acres. The said Eustache Bouvier to thirty-five parts, the whole into one hundred and fifty parts being divided, or equal to one hundred and seventy-five thousand acres. The said Oakes Terrill, Jr., to fifteen parts, the whole into one hundred and fifty parts being divided, or equal to seventy-five thousand acres. The said Edwin C. Searles to fifteen parts, the whole into one hundred and fifty parts being divided, or equal to seventy-five thousand acres. The said William A. Bull to eight parts, the whole into one hundred and fifty parts being divided, or equal to forty thousand acres.

"And, whereas, the said Michael Bouvier is the assignee of a mortgage, made to secure to him the payment of six thousand dollars, with interest for the same (as by reference to the said mortgage and assignment thereof will fully appear), upon all the above-mentioned premises, which mortgage he is about to foreclose, and it is the interest of all parties that he should buy the lands so mortgaged for the purpose hereinafter mentioned, when sold under the said mortgage and the said parties of the second part have each for himself, but not for the others, agreed to give their respective promissory notes to the said Michael Bouvier, for his share of said mortgage, with interest from its date, each deducting from his own note the amount of interest, if any, which he has paid to the said Michael Bouvier on account of said mortgage; that is to say: The said John Herman for three thousand and eighty dollars; the said Eustache Bouvier for fourteen hundred dollars, the said Oakes Terrill, Jr., six hundred dollars; the said Edwin C. Searles, six hundred dollars; and the said William A. Bull for three hundred and twenty dollars, each with interest from the date of said mortgage—the deductions to be made for what interest has been paid as aforesaid, the said notes to be made payable in ninety days from the first day of December, one thousand eight hundred and fifty:

"Now, this agreement witnesseth that the parties have agreed, and by these presents do agree as follows, to wit:

"(1) For and on consideration of said promissory notes, to be given as aforesaid, and also in consideration of a power of attorney, to be given by the said parties of the said part to the said Michael Bouvier, to authorize him to buy the said lands, at any price he may choose to give for the same, and that he shall not be accountable to them for the difference between the amount of his said mortgage and the amount he shall so bid, but that he or his attorney shall have the power to give the sheriff, or other officer who shall make the said sale, a receipt for such difference without any accountability whatever to the parties of the second part, the said Michael Bouvier promises and agrees with the parties of the second part, that he will author Jacob Stras, Esquire, or some other person, to procure the sale of the said land, and to buy in the said lands for him.

"(2) The said Michael Bouvier further promises the parties of the second part that after he shall have obtained a deed for the said lands that he will convey to each of the persons above mentioned, of the second part, who shall have paid the notes aforesaid, which he shall have given to the said Michael Bouvier, his share of the lands each, to his heirs and assigns, for the same title which he may acquire by the sale to be made to him, under the said mortgage, and for no other title; that is to say: To the said John Herman, eighty-five thousand acres, to be surveyed in as near a square lot as may be, next to and adjoining the lands of H. Styles or J. A. Huber; to Oakes Ter-

rill, Jr., seventy-five thousand acres, next adjoining the above lot of John Herman; to Edwin C. Searles, seventy-five thousand acres, next adjoining the land or lot of Oakes Terrill, Jr.; to William A. Bull forty thousand acres, next adjoining the lands or lot of Edwin C. Searles; to Eustache Bouvier one hundred and seventy-five thousand acres, next adjoining the lands of William A. Bull; and to the said John Herman three hundred thousand acres, being the remainder or balance of the said large tract of seven hundred and fifty thousand acres.

"(3) In case upon a survey it should be found that the quantity of land shall not be sufficient to give each of the parties the above-mentioned number of acres, then there shall be a *portionate* abatement or deduction from the shares of the parties, and if the whole should exceed seven hundred and fifty thousand acres, then the surplus shall be conveyed to the parties of the second part in their just proportions.

"(4) Each of the persons comprising the parties of the second part binds himself severally to the said Michael Bouvier to perform his part of this agreement, and also to pay a proportionate share, according to his interest in the said lands, of the money he has already laid out or disbursed, or which he may hereafter lay out or disburse, for or on account of said land, either by paying taxes, or counsel fees, both in the city of Philadelphia, in Virginia, or elsewhere, or for any other expenses he may have to bear or be put on account of the said lands, or the purchase or the sale thereof.

"(5) It is agreed, further, that if either of said parties of the second part, who shall have given his note as aforesaid, to the said Michael Bouvier, shall fail to pay the same when due, this agreement on the part of the said Michael Bouvier to convey the land aforesaid shall be null and void, *and the said Michael Bouvier shall be at liberty to sell such land, upon such failure to any one he shall choose, or to keep the same for himself.*

"(6) It is agreed that the said Michael Bouvier shall direct his attorney to request the sheriff, or other officer who shall sell the said lands (under the said lands) under the said mortgage, to require ten per centum on the amount of the bid he may make.

"(7) And the parties of the second do hereby agree that after the said Michael Bouvier shall have conveyed to them aforenamed, that they will release to each other, so as to make their titles complete.

"In witness whereof, the said parties have hereunto set their hands and seals this seventh day of December, Anno Domini one thousand eight hundred and fifty.     M. Bouvier.          [Seal.]
                                "Oakes Terrill, **Jr.**   [Seal.]
                                "E. C. Searles.      [Seal.]
                                "Wm. A. Bull.        [Seal.]
                                "Eustache Bouvier.   [Seal.]
                                "John Herman.        [Seal.]"

This agreement was recorded in Tazewell county December 8, 1853. It will be seen by this agreement the interests of all these parties in what was supposed to be 750,000 acres of land is fixed as tenants in common as follows:

John Herman............................................... 77/150
Eustache Bouvier.......................................... 35/150
Oakes Terrill............................................. 15/150
Edwin C. Searles.......................................... 15/150
William A. Bull........................................... 8/150

Michael Bouvier is about to foreclose his mortgage, and it is agreed that he shall proceed to do so and buy in the property at the sale, and that each of the parties named shall give to him his note for his proportionate part of the debt and the costs and expenses of sale; said notes payable 90 days from December 1, 1850, with the agreement on the part of Michael Bouvier that he would convey to each of the parties, who paid his note, his proportionate part of the land, to be laid off according to a plan set forth in the agreement. Estimating the land at 750,000 acres, the exact number of acres to be conveyed to each is set forth, but in the third paragraph it is provided that if, on the survey, the quantity falls short, then there should be a pro-

portionate abatement or reduction from the shares of the parties. In the fifth paragraph it is expressly provided that, if either of said parties shall fail to pay his note when due," this agreement on the part of the said Michael Bouvier to convey the land aforesaid shall be null and void, and the said Michael Bouvier shall be at liberty to sell such land, upon such failure, to any one he shall choose, *or to keep the same for himself.*

It will be noticed that in this agreement it is provided that John Herman's 85,000 acres shall be surveyed in as near a square lot as may be next to and adjoining the lands of H. Stiles or J. A. Huber. This Stiles or Huber land is the Beck 50,000 acres, showing that prior to this time Beck had conveyed away his 50,000 acres to Stiles and Huber. We have seen that David S. Hollister's interest had been conveyed to Hamilton September 9, 1848, and by Hamilton to Searles in 1849. *Therefore at the date of this agreement, December 7, 1850, neither Thomas Beck nor David S. Hollister had any interest in these lands, nor did they ever afterwards acquire any interest, and this fact was known to both John Herman and Michael Bouvier.* In accordance with said agreement of December 7, 1850, Michael Bouvier brought suit in the circuit court of Tazewell county, Va., to foreclose his mortgage, and obtained a decree of sale May 14, 1851. The land was sold by Joseph Stras, commissioner, and purchased by Michael Bouvier. The sale was confirmed October 6, 1851; but the deed to Michael Bouvier was not made by Stras, commissioner, until October 16, 1852. By this deed he conveys the two tracts of 320,000 and 480,000 acres to Michael Bouvier, reserving the Beck 50,000 acres.

It is worth noticing that the persons most largely interested in these lands at this time all lived in Philadelphia—Mr. Bouvier, a merchant or manufacturer; Mr. Herman, a druggist; and Eustache Bouvier was a resident of that city, although it does not appear in what business he was engaged. David S. Hollister was also a resident of Philadelphia. This agreement of October 16, 1847, was acknowledged by them in Philadelphia before the same justice of the peace, and the agreement of April 27, 1848, was acknowledged by them in Philadelphia before a commissioner, together with their wives.

Between the time of the sale to Bouvier under the foreclosure proceeding in May, 1851, and the making of the deed to him by Stras, commissioner, October 16, 1852, a survey was made of these two tracts of land by Henry B. Harman, surveyor; that is, the 320,000 acres and the 480,000 acres. It is clearly shown by correspondence between John Herman and Henry B. Harman that this survey was made under the direction of John Herman. It was made in order to carry out the agreement of December 7, 1850, to ascertain whether there was more or less than 750,000 acres to be divided under that agreement, and to enable them to make the division called for in that agreement. According to this correspondence, John Herman had Mr. Harman survey, first, the 320,000 acres, and he was greatly astonished when it developed that it contained only 40,000 acres. He then had him survey the 480,000-acre tract, and it was found to contain only something like 80,000 acres. Then in a letter from Herman to Harman, dated March 24, 1852, Herman directs Harman how to lay off the 157,500 acres remaining after the Beck 50,000 acres had been laid off. He says:

"But as there is but 157,500 in all, this is to be divided into 150 parts, of 1,050 acres each; that is to say:

| | |
|---|---|
| To the owner of 60 parts | 63,000 acres |
| To the owner of 35 parts | 36,750 acres |
| To the owner of 17 parts | 17,850 acres |
| To the owner of 15 parts | 15,750 acres |
| To the owner of 15 parts | 15,750 acres |
| To the owner of 8 parts | 8,400 acres |
| 150 | 157,500 acres |

"Which, according to agreement, is to be divided thus:

   *   *   *   *   *   *   *   *   *   *   *   *   *

"You can see that I have not gone into any exact calculation with the above diagram, but merely to show where the several lines are to run and

the number of acres each parcel is to contain. I have no desire to hurry you, but we would very much like to have the survey by the beginning of May, as by that time Mr. Bouvier expects to receive the deeds which are to be confirmed by your court at the May session.

"In order that you may make *sare*, doubly *save*, I wish you would begin your survey at your beginning corner—that is, the N. W. corner of the large tract—and run all around the 63,000 acres, then around the 36,750-acre tract. then the 8,400, and so on to all. In giving the bounds, please note the exact points of distances at which rivers and creeks are crossed, and, if not too much trouble, please note about the location of the different settlers, thus (x) within the survey, the kind of general quality of timber, soil, or land, whether hilly, stony, barren, or good along the different lines. *of such information as you may easily obtain and that would be interesting to the owners, and that would be interesting to the owners*, as the location of large or small water powers and of any good locations for mining coal along the rivers or creeks, please note the place."

In a letter which he had written to Harman on February 27, 1852, in speaking of the division which he wanted made, he says:

"In a former letter I wrote you that some of the parties interested had not and did not seem willing to pay me their proportion of the expense of your survey, and I think I requested you not to give any one a copy of the survey which was made at my expense, which I fear some one would be mean enough to try to get of you. However, the several owners have agreed to have the land surveyed and divided into these several proportions; but you say that you will not make a survey, without some one authorized to go with you. The resurvey I wish you to make is not upon the field, but from your field notes of the former survey, that was made in detached parts."

Harman made this survey and laid off the several parts actually on the ground, as appears from the deeds which were afterwards made by Bouvier, as they show the character of the country and the objects which he passed in laying out these different parcels. There was a delay on the part of Michael Bouvier in making deeds to the various parties in accordance with the agreement of December 7, 1850, after he had received the deed for all the land from Stras, commissioner. This delay is explained in a letter from Herman to Henry B. Harman, dated April 22, 1853, as follows:

"At long last I received by deed from Mr. B. for any portion of the land, he had refused to sign one without signing all, and the New York parties had refused to acknowledge your survey, and insisted upon having *there* deeds for their proportion part of the 750,000 acres, as they only wanted to sell, such a deed would answer *there* purpose better."

But evidently all parties finally acquiesced in the survey, and, on the 9th day of March, 1853, Michael Bouvier made deeds to all of the parties interested, except Eustache Bouvier and William A. Bull. These deeds from Mr. Bouvier were as follows: March 9, 1853, to John Herman, for 63,000 acres; March 9, 1853, to John Herman. for 17,850 acres; March 9, 1853, to Oakes Terrill, for 15,750 acres; March 9, 1853, to Richard Warren, assignee of Edwin C. Searles, for 15,750 acres.

After these deeds were made there remained in Michael Bouvier the tract of 36,750 acres, originally assigned to Eustache Bouvier, and the 8,400 acres assigned to William A. Bull. It clearly follows from this transaction that William A. Bull failed to make settlement for his interest in the time allowed, or at any time, and that Michael Bouvier retained the legal title to the Eustache Bouvier 36,750 acres and the Bull 8,400 acres in himself, for his own use and benefit; as he had the right to do under the agreement of December 7, 1850, and this is admitted, and not denied, by any one in this cause.

These deeds from Michael Bouvier to these various parties, Richard Warren, John Herman, and Oakes Terrill, are set forth in full as exhibits with the original answer of Howard H. Sypher. (Pages 19 to 40 of his printed answer.) They all contain similar language, and show that they are based upon this survey made by Henry B. Harman. The language used is this in the Herman deed, for instance:

"All that certain tract or piece or parcel of land. situate in the county of Tazewell, in the state of Virginia, bounded and described agreeably to a

recent survey made thereof by Henry B. Harman, surveyor, October, 1852, as follows, to wit:· Beginning," etc., referring to the different divisions, and concluding, after the courses and distances, as follows: "Containing by es-timation according to said Harman's survey of 1852 seventeen thousand eight hundred and fifty acres of land (being part of 750,000 acres of land, which 750,000 is part of two certain tracts of land, one of them containing 480,000 acres patented to Robert *Robert* Morris by the commonwealth of Virginia by patent dated the 23d day of March, 1795, and recorded in said county, and the other of them for 320,000 acres patented to Robert Morris aforesaid by patent dated the 4th day of March, 1795, and recorded in said county, and the said two tracts of land as aforesaid contain by the original patents 800,000 acres, 50,000 acres hereof by actual survey, having heretofore been conveyed, according to the above survey by Henry B. Harman the 750,000 acres are found to contain only 157,500 acres. It being intended hereby to convey to the said John Herman, his heirs and assigns, $17/150$ parts of the said 750,000 acres, be the number of acres more or less, whichever survey be correct, which said last survey of Henry B. Harman (if the same be correct) contains as above computed 157,500 acres, and being part of the same prem-ises which Joseph Stras, commissioner, by the circuit court of Tazewell, by indenture dated the sixteenth day of October, 1852, recorded in Tazewell county in Deed Book No. 10, page 448, etc., granted and conveyed unto the said Michael Bouvier in fee."

·The correspondence between John Herman and Henry B. Harman shows that, after· he received his deeds for the 63,000 acres and the 17,850 acres, John Herman took possession of and visited these tracts of land, and that at ·least on one occasion Michael Bouvier went with him, and he speaks of Mr. Bouvier's lands, his interest in and ownership of these lands over there. It ·also appears that Herman sent his deed to Harman and requested him to place it on record, and he afterwards complains that the clerk had not sent his deed back to him, and he is uneasy about it. These deeds from Michael Bouvier constitute the foundation for the present title of the holders of the several tracts of lands which were conveyed by them. Dr. William R. Iaeger testifies that he is the present owner of the 17,850-acre tract, being the tract known as the "Burkhardt tract," and one of the tracts originally conveyed to John Herman. He is also the owner of the 15,750-acre tract originally conveyed to Oakes Terrill, and that he for a number of years lived on this tract of land. These two tracts now belong to the Iaeger estate. It is shown that the 50,000 acres originally conveyed to Beck is the tract known as the "Buck and Kimes" tract.

On the 7th day of January, 1865, Michael Bouvier and wife conveyed to Patterson, Ridgeway, and Bolton the tract of 36,750 acres originally as-signed to Eustache Bouvier. This is stated to be· in consideration of ,the sum of $65,000 lawful money to them in hand well and truly paid. This tract of land, as shown by the evidence, is the tract known as the "Lasher ·land," at present held by Lasher, Whelen, and others, successors in trust to ·Patterson, Ridgeway, and Bolton. This left the 8,400 acres, which was set apart for William A. Bull, still in the hands of Michael Bouvier.

Let us trace the history of these several tracts of land after 1853. From the year 1859 to 1870, both inclusive, Michael Bouvier, of Philadelphia, was assessed with 45,150 acres in McDowell and Wyoming counties. This is exactly the aggregate of the Eustache Bouvier tract of 36,750 acres and the William A. Bull tract of 8,400 acres. The deed from Bouvier to Patter-son, Ridgeway, and Bolton, which is dated January 7, 1865, was probably not recorded until 1869. From the year 1871 to 1876, Michael Bouvier is assessed with 8,400 acres, and Patterson, Ridgeway, and Bolton with 36,750 acres. For the years ·1875 and 1876 the 8,400 acres was delinquent in the name of Michael Bouvier, was sold to the state, and subsequently redeemed in 1893, and restored to the land books in 1894, with back taxes for two ·years, and the taxes have been regularly paid on it since that time in the ·name of Bouvier's heirs up to 1907. The 36,750 acres was assessed to and taxes paid on it by Patterson, Ridgeway, and Bolton and their successors in trust from 1871 to the present time.

*Michael Bouvier died June 9, 1874.* On August 31, 1865, Michael Bouvier wrote a letter to John Herman, filed with the deposition of M. C. Bouvier, telling Herman that certain parties were coming to look at his land in West Virginia and asking Herman to give them such information as he could. This letter was found among the papers of Col. G. W. G. Iaeger, and the proof is sufficient to show that Col. Iaeger got this letter, with a large number of other papers relating to these lands, from Henry B. Harman, with whom John Herman was in communication at this time, and it is a fair inference that Herman sent this letter with the persons mentioned by Mr. Bouvier to Henry B. Harman, and necessarily that it related to the 8,400 acres in McDowell county. Michael Bouvier had lived in Philadelphia with his wife and three daughters up to the time of his death.

On June 20, 1890, a letter was written in the name of Josiah R. Sypher, an attorney at Philadelphia, to M. C. Bouvier, manifestly in the handwriting of the defendant, Howard H. Sypher, stating that he had important papers in his possession, showing that the estate of Michael Bouvier had the title to this 8,400 acres, and in a letter from Josiah R. Sypher to M. C. Bouvier, dated July 2, 1890, he says: "I have found, upon examination of the records and papers, that your father still owned the tract of 8,400 acres in West Virginia at the time of his death." And he says that proceedings are under way to sell the land for the benefit of the school fund, but that it can yet be redeemed, and he advised Mr. Bouvier to redeem the land for the benefit of his father's estate, and in subsequent letters, dated August 4, 1890, and October 13, 1890, he shows the progress made in proceedings for redemption. In a letter dated December 26, 1890, he shows that the deed from Michael Bouvier to Patterson, Ridgeway, and Bolton did not affect the title to the 8,400 acres, but that that property still stood in the name of Michael Bouvier. In a letter dated June 20, 1891, in the handwriting of Howard H. Sypher, Josiah R. Sypher says that he has in his possession papers which he thinks will show title in Michael Bouvier at the time of his death to the 8,400 acres in West Virginia. And in a letter dated October 14, 1891, also in the handwriting of Howard H. Sypher, he notified Mr. Bouvier that the land had been redeemed. And in a letter dated May 5, 1894, to John Vernou Bouvier, from Sypher & Sypher, they give an account of the survey of the 36,750 acres and of the running of the common lines between that tract and the 8,400 acres, and that they had notified Col. Iaeger that they intended to survey the 8,400 acres in a short time, and that there is no doubt that it will overlap the Iaeger tract, and that such overlapping would be subject for adjustment in an amicable negotiation, etc.

P. W. Strother, one of the counsel for the defendants in this suit, was employed by Sypher to conduct the redemption proceedings and in other ways in connection with these lands, and Mr. Bouvier paid him a fee of $500 for the services rendered, as shown by the letter of Josiah R. Sypher, dated May 20, 1895. On October 1, 1895, Mr. Sypher writes to Mr. Bouvier that one Ritter, who has a sawmill on Elk Horn, is cutting and removing timber from his tract in McDowell county, and advises that an injunction be gotten to restrain him in his depredations. The heirs of Michael Bouvier brought suit in ejectment against Edward Hopkins, W. G. S. Jones, and others in the Circuit Court of the United States for the District of West Virginia, at Charleston, on the ——— day of ———, 189—, to recover portions of this 8,400 acres claimed by the defendants. (See Exhibit Smith No. 15, filed with the deposition of Harrison B. Smith). Suit was brought by the firm of Couch, Flournoy & Price, of Charleston, W. Va., and Sypher & Sypher, of Philadelphia; the defendant Howard H. Sypher being one member of the latter firm.

It is shown that there was a conflict, or an apparent conflict, between the boundaries of the Iaeger 150,000-acre tract and this Bouvier 8,400 acres, and that Mr. S. L. Flournoy had been counsel for both of these parties in other matters, and through him a compromise was effected, by which the southern portion of the 8,400 acres was conveyed by the Bouviers and Iaeger to S. L. Flournoy, trustee, and by him conveyed to a corporation under the name of the Bouvier-Iaeger Coal Land Company, the plaintiff in this case; one-half of the stock being taken by the Bouviers and one-half by Iaeger.

This transaction took place in the years 1902 and 1903. Ever since that time the Bouvier-Iaeger Coal Land Company has exercised control over the portion of the said 8,400 acres conveyed to it, and leased portions of it for coal mining purposes, has sold and disposed of other portions, has exchanged some portions for other lands, has sold timber upon it, and the same has been cut and the purchase money paid. It has been assessed on the land books of McDowell to the plaintiff, and in a great many other ways it has exercised full ownership and control of it. It is therefore clear from these facts that from 1853, when Michael Bouvier made deeds to the other claimants, to the present time, he and those claiming under him have claimed title, paid taxes, and exercised acts of ownership in almost every way conceivable over the lands affected in this suit—that is, the 8,400 acres—and his title has been recognized by John Herman, by the defendant Sypher and his father, and by the heirs of Mr. John Herman, including the defendant, Cornelia M. Herman, at all times up to the year 1906. This is shown by the correspondence between Herman and Bouvier, between Herman and Harman, between Sypher and Bouvier, and by the deeds made by Herman and his heirs.

### History of the Herman Tracts.

It seems that at the time Michael Bouvier conveyed to Herman the two tracts, one of 63,000 acres and the other of 17,850 acres, Herman gave his notes, and to secure the payment of the same gave mortgages on each of these tracts to Mr. Bouvier. The mortgage on the 63,000-acre tract was for $2,421. Bouvier assigned this mortgage to Theodore S. Williams in November, 1855, and Williams assigned it to Crosby S. Noyes January 1, 1867, and after John Herman's death, which occurred in 1866, said Crosby S. Noyes brought suit against the heirs of John Herman, Michael Bouvier, and others on the 15th day of January, 1869, for the foreclosure of his mortgage, and on March 26, 1870, in this proceeding, a decree of sale was entered, and the land was subsequently sold under this decree and purchased by Crosby S. Noyes, and by him the title has passed to the present owners. Herman also gave a mortgage to Bouvier on the 17,850 acres, and Bouvier assigned this mortgage to George J. Burkhart. Herman, in the meantime, had conveyed the land to his son, Theodore A. Herman, subject to the mortgage. George L. Burkhart brought suit in 1867 to foreclose this mortgage, and on the 8th day of May, 1867, a decree of sale was entered, and the land was sold to said Burkhart, and a deed made to him, dated February 8, 1868, by the special commissioner. This land has been known as the "Burkhart tract" of land ever since, and was involved in the suit of Sayers v. Burkhart, 85 Fed. 246. 29 C. C. A. 137, in which the Burkhart title was established as against certain third parties.

The tract of 36,750 acres, which was sold by Mr. Bouvier to Patterson, Ridgeway, and others for $65,000 in 1865, was also the subject of litigation in the case of Boulton, Lasher and Others v. McCreary and Others, 66 Fed. 834, which went to the United States Circuit Court of Appeals from this court. Certain portions of these lands had been sold by the commissioner of school lands by a proceeding against the original title, and the court, in this suit, set aside these deeds and proceedings, and established the title of Boulton, Lasher, and others derived from Bouvier. In this suit Josiah R. Sypher appeared as counsel for the Lasher trustees, along with the firm of Flournoy, Price & Smith, and it appears from the testimony of Mr. Smith that these attorneys obtained an interest in the lands, and that he is collecting funds on account of that interest, and is still paying them over to the widow and heirs of Josiah R. Sypher, one of whom is the defendant Howard H. Sypher.

As we have seen, the Oakes Terrill tract passed to Col. Iaeger, and is now owned by his heirs. The Thomas Beck tract of 50,000 acres passed to Max Lansburg.

So far as the records of McDowell county disclosed, there was no claim of any kind on the part of John Herman, or his heirs, or any one else, except certain adverse claimants, squatters, or others to this 8,400 acres, as against the Bouvier title, until the year 1877. On the 24th day of May, 1877, the deed, which is claimed to be a forgery in plaintiff's bill in this case, was

recorded in the county court clerk's office of McDowell county. The original of that deed has not been produced and cannot be found, and never has been seen by any of the parties interested in this cause. According to the record, it is a deed dated the 10th day of November in the year of our Lord 1858, between Michael Bouvier and Louwesa C., wife, and Thomas Beck, widower, and David S. Hollister, unmarried, parties of the first part, and. John Herman, party of the second part, purporting, in consideration of $1 and other valuable considerations, and in order to invest the title to the land in the said John Herman, party of the second part, in order that he may sell and dispose of the same to a better advantage, to convey all the interest of the said parties of the first part in the two tracts of 480.000 acres and 320,000 acres. And it contains the following warranty: "And the said parties of the first part does hereby covenant and agree to and with the said party of the second part that at the time of the delivery hereof the said parties of the first part are the lawful owners of the premises above granted, and seized thereof in fee simple, absolute, and that they will warrant and defend the above granted premises in the quiet and peaceable possession of the said party of the second part, his heirs and assigns forever." It purports to be signed by M. *Bovier* and *Louciea C. Bovier* and David S. Hollister, and pur· ports to have been acknowledged by Michael *Borier* and *Louisa C. Bouvier*, his wife, and by Thomas Beck and David S. Hollister, before S. C. Perrin. clerk Kenton county court, Kentucky.

On the margin of the deed book is this memorandum: "This deed was mailed to S. S. Marsh, care H. T. Basford, P. O. Box 3476, New York, June 29/77." There is no evidence to show who presented this alleged deed for record, unless the inference is to be drawn that it had been sent by S. S. Marsh, to whom it is returned. No attempt was made on the part of the defendants to account for the recording of this deed, or for the original, or to give any account of Marsh or Basford in any way. The plaintiffs made diligent search and inquiry for these people, and were informed by a man in New York that Basford was a lawyer and Marsh was a clerk, but nothing was found in regard to this deed, though the informant had heard something said about some claim to West Virginia lands.

It appears that S. C. Perrin was elected clerk of the county court of Kenton county, Ky., in August, 1858. *He died on the 24th day of May, 1876,* before this deed was recorded. At the time, therefore, this alleged deed was recorded, both Michael Bouvier and his wife were dead, John Herman and his son. Theodore A. Herman, were dead, and S. C. Perrin, the clerk before whom it is claimed to have been acknowledged, is also dead. Beck had parted with all his interest in these lands in 1847, and Hollister had conveyed his interest away to Hamilton, and it had passed to Searles before 1853. Bouvier had conveyed all these lands, except the 8,400 acres, and Herman had, in his lifetime, conveyed his two large tracts of 63,000 acres and 17,850 acres to a corporation of which he probably held the stock, and his heirs had permitted them to be sold under his mortgages, which he gave to Bouvier in 1853. No claim of any kind had ever been asserted by Herman or his heirs to this 8,400 acres, or to any part of the original tracts, except the two tracts of 63,000 and 17,850 acres. After this deed was put on record, the 8,400 acres was not assessed to Herman, or his heirs or devisees. No attempt was made to take possession of it, or assert title to it, in any way. Nothing was done about it, except merely to record the deed, until 1906. On the contrary, there is evidence in the record, which cannot be disputed by either Cornelia M. Herman or Howard H. Sypher, that the heirs of John Herman did not claim title to this 8,400 acres, but admitted that the title to it was in the devisees of Michael Bouvier.

The evidence shows that in a suit, known as the "King suit," the location of the boundaries of the King tract adjoining the 480,000-acre tract, was involved. King was seeking to get the court to hold that the bounds of his tract extended beyond the limits fixed in the H. B. Harman survey of the 480,000 acres. And the idea in bringing this suit for Cornelia Herman was that, if the King tract was thus extended, the adjoining line of the 480,000 acres would be extended with it, as they were coterminous, and it would thus embrace a large body of land which had not been included in the Har-

man survey, and Miss Herman would be entitled to $77/150$ of such additional land. It will be remembered that in the deeds made by Michael Bouvier to the various persons, after the Harman survey, it was provided that they should have a certain percentage of whatever lands were embraced in these two large surveys, if it should turn out that there was more than 207,500 acres. In order that the heirs of John Herman might get the benefit of such an extension of the boundaries, if it should be made, his daughter, Cornelia M. Herman, one of the defendants in this cause, employed Josiah R. Sypher, the father of the other defendant, Howard H. Sypher, and Flournoy & Mollohan to bring such suits as might be necessary to establish her rights to any such excess, on a contingent fee, and Josiah R. Sypher, in July, 1895, wrote to S. L. Flournoy the following letter:

"Your letter of the 1st received, and contents noted. John Herman died some 25 years ago, leaving surviving him his widow, one son, and two daughters. The son and one of the daughters have since died unmarried, leaving the widow and one daughter, Cornelia M. Herman, the only heirs at law. I have the consent of these to bring the suit in their names; that is, Mary Ann Herman, widow and executrix of the estate of John Herman, deceased, and Cornelia M. Herman, daughter of John Herman and Mary Ann, his wife, citizens and residents of Philadelphia. You or Mr. Meloney may sign the bill as attorney for the complainants. You perceive that it makes no difference whether the father deeded the property to the son, as the death of the father and son reunited the inheritance in the mother and daughter. The father deeded the 17,850-acre tract to the son, Theodore Herman; but the larger tract of 63,000 acres remained in the father until the time of his death.

"Michael Bouvier died in 1874 (?), having appointed Francis A. Drexel, John V. Bouvier, Michael C. Bouvier, and Zenaide S. Bouvier, executors and trustees of his estate. Francis A. Drexel has since died, leaving his successors to administer the estate. The heirs now living, in New York, are John V. Bouvier, Michael C. Bouvier, Miss Zenaide S. Bouvier, Miss A. E. Bouvier, Miss M. H. Bouvier, in Philadelphia, Mrs. Theresa E. Patterson, widow, Mrs. Mary L. Walsh, wife of Charles Walsh, Mrs. Louisa B. Ewing, wife of Bernard N. Ewing, and Miss Elizabeth C. B. Dixon.

"The Oakes Terrill, Jr., tract of 15,750 acres now belongs to Dr. Wm. R. Iaeger. I have not been able to learn as yet whether Terrill conveyed the excess to his grantees or not. Oakes Terrill is still living and resides in New York City. Richard Warren I find conveyed to Lissack H. Simpson one-half the tract of 15,750 acres, including the provisions for the larger survey, and Simpson sold to McCormick, and it is quite possible that he included the outlying tract. I should say that Lissack H. Simpson died, and S. L. Simpson conveyed the lands to McCormick. If the extra allotment was conveyed to McCormick, it will give us a substantial party in the suit. I will endeavor to see him and advise you by telegraph.

"This includes the entire list of the original grantees. The tract of 8,400 acres was to have been conveyed to Wm. A. Bull; but he failed to comply with the terms of the agreement, and it remained in Michael Bouvier. I enclose you copies of an abstract of Irwin's title, and also a brief from Michael Bouvier to Henry I. Morris, which is the beginning of the fraudulent conveyance.

"Very truly,                                    J. R. Sypher."

And on the 29th day of July, 1895, Sypher procured Mary Ann Herman and Cornelia M. Herman to make a deed to him and Wesley Mollohan and S. L. Flournoy for an undivided one-half interest in the 320,000 and 480,000 acre tracts, stating:

"The interests now vested in the parties of the first part in the said two tracts of land are seventy-seven one hundred and fiftieths ($77/150$) undivided parts, or the portions thereof which were not conveyed away by the said John Herman in his lifetime to persons other than the said Theodore Herman; and it is the object and intent of the parties of the first part to convey, and they do hereby grant and convey, unto the said parties of the second part, one-half undivided of all their right, title, interest, and claim, of every kind and however derived, in, of, and to said two tracts of land, to be held and owned by said parties of the second part equally as between themselves.

Reference is here had, for further description of said lands and of the interests hereby intended to be conveyed, to two certain deeds from Michael Bouvier and wife to John Herman, bearing date on the 9th day of March, 1853, and recorded in the county court clerk's offices of Tazewell county, Virginia, and Wyoming county, West Virginia, respectively."

The signatures of Cornelia M. Herman and Mary Ann Herman to this deed were witnessed by William H. Burkhart, who subsequently figures as the attorney in fact, by whom, in 1906, a deed was made to Howard H. Sypher, and under which he now claims title through this alleged deed of 1858. It will be noticed that in this deed the foundation of the title of the widow and heirs of John Herman is stated to be the two deeds which Michael Bouvier made in 1853 to John Herman. No mention is made of the alleged deed of 1858, which had been recorded in 1877, and it will be noted that they only claim $77/150$ of the two tracts, which is the original proportion allotted to them on the division after the purchase by Bouvier, and therefore does not include the Bull interest of $8/150$. In other words, if at this time they were claiming the 8,400 acres, they would have stated their interest to be $85/150$, instead of $77/150$.

In pursuance of their employment above mentioned, a bill was filed by the attorneys mentioned, in the name of Mary Ann Herman and Cornelia M. Herman, in the circuit court of McDowell county, against Jesse R. Irwin, the Bouviers, Simpsons, Pattersons, and a number of other people, in which a claim is made to $77/150$ parts of the surplus over and above what was conveyed to them under the Harman survey. The history of this title is fully set out in this bill. It is stated that William A. Bull and Eustache Bouvier had failed to pay their respective portions of the debt and costs to Michael Bouvier, and that "the said Michael Bouvier elected, as he had the right to do under the agreement, to keep the same, the shares of said land allotted to said Bull and Eustache Bouvier, for himself, and therefore made no conveyance of said shares until many years afterwards," etc.

The bill further contains this language: "And the plaintiff says that upon the execution of the deeds aforesaid the said John Herman became the owner in severalty of the two tracts of 63,000 acres and 17,850 acres, the said Oakes Terrill, Jr., the owner in severalty of the tract of 15,750 acres conveyed to him, the said Richard Warren the owner in severalty of the tract of 15,750 acres, and the said Michael Bouvier the owner in severalty of the two tracts of 36,750 acres and 8,400 acres, and all the rest and residue of said 480,000 acres not embraced or included in the boundaries of the said six several tracts, or either of them, remained unpartitioned and in common, and title thereto vested in the said John Herman, Oakes Terrill, Jr., Richard Warren, and Michael Bouvier, as tenants in common, the same being owned by them in the following proportions, to wit: John Herman, $77/150$ thereof; Oakes Terrill, $15/150$ thereof; Richard Warren, $15/150$ thereof; and Michael Bouvier, $43/150$ thereof."

And it is set out in various ways that these heirs of John Herman were tenants in common with the heirs of Michael Bouvier and the other parties mentioned in any surplus that might be found over and above the Harman survey. And then the bill contains this statement: "Michael Bouvier departed this life in the year 1881, in the city of Philadelphia, leaving as his heirs at law and devisees John V. Bouvier, Michael C. Bouvier, Zenaide S. Bouvier, Louise A. Bouvier, A. E. Bouvier, M. H. Bouvier, Theresa Patterson, Mary L. Walsh, Louise B. Ewing, and Elizabeth B. Dixon, and as the executors and trustees of his estate the said John V. Bouvier, Michael C. Bouvier, and Zenaide S. Bouvier, and all the rights, titles, and interests of the said Michael Bouvier in said lands are now vested in said parties as the heirs at law of the said Michael Bouvier, or as devisees and executors under his will, which has been recorded in said county of McDowell."

The attorneys' names signed to this bill are Couch, Flournoy & Price, Mollohan & McClintic, and Sypher & Sypher; the defendant Howard H. Sypher being a member of the last-named firm.

In addition to this suit a petition was filed in the chancery cause pending in this court of State of West Virginia v. Alexander McClintic and others, by Cornelia M. Herman, in which the title to a part of the 480,000-acre tract

would be involved if the boundaries were extended as above mentioned, and in this case the same facts are related and the same claim and theory asserted.

The deed to Sypher, Mollohan and Flournoy, for a one-half interest, made by Mary Ann Herman and Cornelia M. Herman, was never recorded, being held to await the result of the King litigation. King failed to establish the boundaries he claimed, and the suit and partition above mentioned, it seems, were therefore not pressed; but the original deed is still held by the attorneys above mentioned for a one-half interest.

In the course of time it seems that Josiah R. Sypher died, and that after his death in 1906 his son and late partner, Howard H. Sypher, had the following papers recorded in McDowell county, namely:

A power of attorney from Cornelia M. Herman to William Henry Burkhart, authorizing him to collect moneys, execute notes, bonds, and other instruments, sell any real estate of which she is now seised, execute and acknowledge any deeds, leases, or other assurances that he may deem expedient in her name, and to compromise any litigation, disputed claims, etc. This power of attorney is dated October 25, 1905, and was recorded April 27, 1906.

The next paper is an agreement, dated June 27, 1906, between Cornelia M. Herman, acting by William Henry Burkhart, her attorney, and Howard H. Sypher, by which she employs said Sypher to take the necessary steps to perfect her title for the undisputed possession of certain lands in McDowell, Raleigh, Wyoming, and Boone counties, W. Va., and agrees to convey him a one-half interest in said lands for his services.

The next paper is a deed, dated June 27, 1906, from Cornelia M. Herman, by William Henry Burkhart, her attorney, to Howard H. Sypher, conveying, in consideration of $1 and other good and valuable considerations, an undivided half interest in the two tracts of 480,000 and 320,000 acres, describing them at great length by metes and bounds, and giving the manner in which she claims under her father, John Herman, and her deceased mother and brothers and sisters. This is the same William Henry Burkhart who witnessed the deed made by Cornelia M. Herman and Mary Ann Herman to Flournoy, Mollohan and Sypher for a one-half interest in these lands.

The next paper is a contract, by which Howard H. Sypher employs Judge P. W. Strother, in consideration of a contingent fee of $15,000, to attempt to recover these lands. After these papers were recorded, Howard H. Sypher attempted to and took steps to get into possession of this 8,400 acres, and as soon as this was done the present suit was brought by the plaintiffs, the object of which is to set aside and declare the alleged deed of 1858 from Michael Bouvier to John Herman to be a forgery.

In this connection it is proper to call attention to a deed, dated February 12, 1866, from Josiah R. Sypher and wife to Theodore A. Herman, by which, in consideration of the sum of $15,000, Sypher and wife convey to Theodore A. Herman an equal undivided half in the tract of 17,850 acres, which was conveyed to John Herman by Michael Bouvier by deed of 1853, and which, as stated in this deed, was conveyed to the said Josiah R. Sypher by John Herman and wife, by deed dated April 7, 1865, and intended to be forthwith recorded. This last-mentioned deed does not seem to have been recorded. This fact is mentioned as showing that Sypher represented John Herman with reference to these lands before his death, as this deed shows a conveyance by John Herman to Sypher in 1865; whereas, John Herman did not die until January 1866. Michael Bouvier died in 1874, and his wife in 1872.

It is proper to call attention to certain features of the alleged deed of November 10, 1858, which is attacked in this case as a forgery. The first is that it is dated in 1858, but not recorded until 1877, 19 years after its alleged date, and no explanation is found as to why it was not recorded, if it were in existence. The names of Michael Bouvier and his wife are misspelled throughout, and there are a great many other words misspelled, the same word being spelled differently in different places in the deed. In the caption, the grantors are given as Michael Bovier and Louisa C., his wife, and Thomas Beck, widower, and David S. Hollister, unmarried. The deed does not profess to be signed by Thomas Beck, but purports to have been acknowledged by him. It is signed by David S. Hollister, and also acknowl-

edged by him. It would be inferred from this caption that David S. Hollister was never married, because, if he had been and had lost his wife, he would have been spoken of as a widower, just as Thomas Beck was. The fact is, as the deeds filed in this case show, David S. Hollister had been a married man; his wife being named Mary Ann. The certificate of acknowledgment concludes as follows: "Witness my hand and official seal the day and year first above written. S. C. Perrin, Clerk Kenton County Court, Kentucky." And on the margin of the record there appear the words "Official Seal." It does not purport to be the seal of the county court, and so far as the record discloses there is no way of determining what kind of a seal it was.

The evidence shows that Beck's 50,000 acres was not an undivided interest, but was laid off to itself, and had been considered a distinct parcel of land ever since the deed to him, and there could be no pretense that he had any interest in the 480,000 and 320,000 acres, in connection with Bouvier and Hollister. Hollister's interest had been conveyed to Hamilton in 1848, and by Hamilton to Searles in 1849, and Searles had participated in the agreement of December 7, 1850, providing for the sale of the land and its purchase by Bouvier, and under that agreement deeds had been made to Terrill and Warren. The deed professes to convey the interest of the grantors in the two original tracts of 480,000 and 320,000 acres. These tracts had, five years before the alleged date of this deed, been broken up and divided amongst the parties as shown.

Hollister was a Philadelphia man, along with Bouvier, Herman, and Sypher. Beck lived in Baltimore, as shown by the deeds. The deed professes to be upon consideration of $1 and other valuable considerations, "and in order to invest the title to the land hereafter to be conveyed and described in the said party of the second part, *in order that he may sell and dispose of the same to a better advantage, these presents are duly made.*"

Attention is called to the covenant of the grantors: "And the said parties of the first part does hereby covenant and agree to and with the said party of the second part that at the time of the delivery hereof said parties of the first part *are the lawful owners of the premises above granted and seised thereof in fee simple absolute.*" Michael Bouvier was very careful, in making the deeds for portions of these lands under the agreement of December 7, 1850, to describe accurately the part conveyed, and to set forth how it was derived, and to give only a special warranty. The evidence shows that Michael Bouvier always wrote his name M. Bouvier, and that he was an intelligent man, who wrote and spelled correctly.

### Place.

This alleged deed purports to have been acknowledged before the clerk of the county court of Kenton county, Ky., in 1858. The evidence shows that Kenton county is the county that lies opposite Cincinnati, Ohio, in which is the present city of Covington. In 1858 the county seat was Independence, a small town of 200 inhabitants, 12 miles out in the hills from Covington, 14 miles from the Ohio river. It was the only county seat at that time, and all the records of the court proceedings prior to 1860 are found in the clerk's office at Independence. In 1860 a branch county seat was established at Covington, but the records of 1858 are all at Independence. It was a hilly, limestone, agricultural country with no minerals or other special resources.

By agreement of parties, the age of Mr. Bouvier was stated to be 64 years, and Mrs. Bouvier 61 years in 1858. He was in delicate health, being afflicted with valvular trouble of the heart, from which he became unconscious at times, and was not permitted to travel by himself. Some of the family always went with him. Mrs. Bouvier never traveled from home, except on the rarest occasions and from necessity, and was subject to car sickness in a very distressing way when she traveled. At that time the route of travel to Cincinnati, or Kenton county, Ky., from Philadelphia, was by railroad to Pittsburg, and then through Ohio to Cincinnati, or by boat down the Ohio river. There were no sleeping cars or accommodations, and the custom was for passengers to travel from Philadelphia as far as Altoona, and stay there overnight, then go to Pittsburg, and then take one of the two routes through Ohio. The round trip might have been made, by making close connections, in four days, but that was manifestly almost impossible.

186 F.—42

The evidence shows that Michael Bouvier and his family lived at 1240 North Broad street, Philadelphia, from 1854 until 1874; the family consisting of the father and mother and three daughters, Alexine, Mary, and Zenaide, and two sons, John Vernou and M. C. Bouvier. These three daughters have never married, and after their father's death they moved to New York, where they have lived ever since and are still living with their brother, M. C. Bouvier, who is also unmarried. These three ladies and their brother, John Vernou Bouvier, all testify, in most positive terms, that neither their father nor their mother ever went West at all. They were never in Cincinnati, or Covington, or Kenton county, Ky. Mr. Bouvier, with two of his daughters, went in 1857, the year the Philadelphia Bank failed, to Tazewell county, Virginia, by way of Richmond, to visit these lands. And when John was wounded during the war at Fairfax Court House, Mr. and Mrs. Bouvier and one or more of the daughters went to see him. A trip was taken by their mother once to Boston. These were the only trips taken by Mrs. Bouvier, and Mr. Bouvier was not permitted to travel without some one of the family accompanying him. The daughters lived closely at home. They were home bodies, occasionally went to the seashore for a few days in summer, but otherwise remained in the family, and they testify definitely with reference to November, 1858, that it is impossible that their father and mother could have taken a trip to Kenton county, Ky., without their knowing it, and that no such trip was taken.

John Vernon Bouvier, Price, Smith, Spillman & Clay, and Frank A. Harrigan, for plaintiff.

Holt & Duncan, for defendants.

KELLER, District Judge (after stating the facts as above). The bill prays that the deed of November 10, 1858, may be canceled as a forgery, and as a cloud upon the title of complainant. It is admitted that, except for said deed, the complainant has title to the land in controversy, and it is also admitted, in the answers of the defendants, Sypher and Cornelia Herman, that the complainant up to 1906 or 1907 had possession of and exercised acts of ownership over the lands involved, and received income therefrom. After the long and detailed statement made, I do not feel it necessary to do more than indicate very briefly my reasons for deciding this case in favor of the plaintiff.

These reasons group themselves into those that are based upon indicia that the deed of November 10, 1858, is, as alleged, a forgery, and those that go to show that, even if not a forgery, it was never completed by valid delivery, and hence is invalid as a source of title, and should be canceled under the prayer for relief contained in the bill. And the indicia of forgery group themselves into those which are evidenced by the deed itself (or, rather, its record, as the paper itself is not produced, and the defendants disclaim any knowledge whatever about it), and those evidenced by other facts or testimony.

Among the indicia of the first class I may name:

(1) In view of the state of the proved and admitted facts as to the title of the lands embraced in the two Robert Morris patents for 320,-000 acres and 480,000 acres at the date of the purported execution of this deed, to wit:

(a) That Thomas Beck, at that time and for long prior thereto, had no interest therein; he having long theretofore received a deed for his 50,000 acres described by metes and bounds, and having prior to 1850 conveyed the same to H. Styles or J. A. Huber, as shown in the agreement of December 7, 1850; and

(b) That David S. Hollister, at the date of said deed, had no interest in said land, having parted with his interest therein to Edwin C. Searles and Oakes Terrill by assignment, and the Searles interest having been assigned to Richard Warren prior to March 9, 1853, and all of the Hollister interest having been actually conveyed by Bouvier and wife by metes and bounds by the deeds dated March 9, 1853, to Oakes Terrill and Richard Warren, respectively.

It is a matter throwing the gravest doubt upon the authenticity of this deed that Thomas Beck and David S. Hollister should have been named as grantors therein. . Both Michael Bouvier, the remaining grantor, and John Herman, the purported grantee, as well as Beck and Hollister themselves, well knew that the two latter persons had no interest whatever in the lands mentioned in the deed, and that their former interests were owned in severalty by Styles or Huber, Terrill, and Warren, and, as to those interests, all the grantors knew they were conveying nothing, and the grantee knew he was receiving nothing. To hold this deed as other than a forgery convicts Beck and Hollister of attempted fraud, and Bouvier and Herman of participation therein.

(2) The fact that David S. Hollister is described in the deed as "unmarried" indicates that the parties who prepared this deed were not familiar with the facts, as in the trust deed made October 16, 1847, by Herman, Hollister, and Eustache Bouvier to Michael Bouvier and Thomas Rawlings, said Hollister is joined by "Mary Ann Hollister," his wife, and, while there is nothing in the record to show that she continued in life to the date of this deed, his description as "unmarried" does not comport with the facts.

(3) The apparent ignorance of the existence of the Harman survey, the Bouvier section deeds, and all of the changes of ownership from undivided interests to definite ownership of tracts by metes and bounds. In order to credit the recitals in this deed with common honesty, it is necessary to predicate to the scrivener and to the parties ignorance of these various changes; and this, as the statement shows, cannot be done as to *any* of the parties to this deed. John Herman caused the Harman survey to be made and received his two deeds for 63,000 acres and 17,850 acres, respectively. Michael Bouvier executed those deeds, and two others to Terrill and Warren for the Hollister interest.

(4) The careless and faulty wording of the deed itself, as compared with the extremely careful and painstaking deeds theretofore made by Michael Bouvier in all of his transactions concerning these same lands, all of which former deeds were evidently the handiwork of expert conveyancers.

(5) The astounding and unexplained and seemingly inexplicable fact that this deed, purporting to be made and signed by David S. Hollister, Michael Bouvier, and Louisa C., his wife, all three being residents of the city of Philadelphia, should have been carried to the village of Independence, Kenton county, Ky., 14 or 15 miles from the city of Cincinnati, and 11 or 12 miles from the railroad, to be acknowledged. Every other deed made by either of the three parties named was acknowledged in the city of their residence.

(6) The fact that the deed was not admitted to record until 1877, after the purported grantors, the grantee, and S. C. Perrin, the clerk of the county court of Kenton county, Ky., before whom the deed purported to have been acknowledged, were all dead, and hence could not be interrogated respecting the facts.

Among the indicia of forgery presented by facts or evidence outside the record of the deed itself, I note the positive evidence of living members of the Bouvier family that in the year 1858 neither Michael Bouvier nor Louisa C. Bouvier, the father and mother of the witnesses, and the alleged grantors in the deed, visited the state of Kentucky. This evidence, to my mind, was extremely convincing, coupled as it was with evidence as to the trip to Tazewell, Va., in 1857, and the reasons why the father never traveled unattended, and the mother seldom at all, except in cases of necessity, and taken with the other internal evidence to which I have alluded, and that to which I shall allude hereafter, leaves no doubt in my mind that neither Michael Bouvier nor Louisa C., his wife, acknowledged the deed of November 10, 1858, or was, on that date or in that year, at the county seat of Kenton county, Ky.

[1] At the hearing the point was attempted to be made that the evidence of the Misses Bouvier and others to show that their father and mother were not in Kentucky in 1858, and hence could not have acknowledged the deed of November 10, 1858, was inadmissible. This is not the law. It is always admissible to show that parties never appeared before the officer and acknowledged a deed. 1 Ency. of Law (1st Ed.) p. 160, and cases cited; Donahue v. Mills, 41 Ark. 421; Pickens v. Knisely, 29 W. Va. 1, 11 S. E. 932, 6 Am. St. Rep. 622. There is a wide distinction between this and the admission of an appearance before the officer, but a denial of the occurrence of certain of the material incidents recited in the certificate. In the latter class of cases it is generally held that the recitals in the certificate can only be impeached for fraud or imposition, and then only if the knowledge or notice of the fraud can be brought home to the grantee. 1 Ency. of Law, p. 160.

It would, indeed, be a most unfortunate state of affairs if it were to be held that parol evidence that the alleged grantors in a deed were not present before the officer named therein, and could not have acknowledged the same before him, could not be given in respect to an instrument which was never produced for record for 19 years after its purported execution, and not so produced until after every person connected with the alleged instrument was dead. And especially in a case where the sole evidence of its *existence* lies in the record so made after the lapse of 19 years, and where there is nothing to show that, even at the time of its recordation, the paper so recorded was or ever had been in the possession of the grantee named therein, nor that any claim was made under said instrument for 30 years after such recordation.

[2] Among the evidences repelling the presumption of the delivery of the deed, which would ordinarily arise from the fact of recordation, I may mention:

(1) The fact that the deed was not recorded until 19 years after its date. In Equitable Mortgage Company v. Brown, 105 Ga. 475, 30 S. E. 687, it was held that there is no presumption of delivery where it appears that the deed was registered after the grantor's death. See, also, Hill v. McNichol, 80 Me. 209, 13 Atl. 883; Walsh v. V. M. Ins. Co., 54 Vt. 351; Knolls v. Barnhart, 71 N. Y. 474; Ten Eyck v. Whitbeck, 156 N. Y. 352, 50 N. E. 963.

(2) The absence of any claim by the grantee or those claiming under him for about 30 years after the deed was recorded, or nearly 50 years after its date. See cases above noted, and also Marnix v. Riordan, 75 App. Div. 135, 77 N. Y. Supp. 357 (1902).

(3) The fact that for all of said 30 years no taxes were paid by the descendants of the alleged grantee.

(4) The acts and conduct of the grantor subsequent to the date of the alleged deed are absolutely inconsistent with an intention on his part to execute and deliver the deed in question. His payment of taxes up to his death in 1874, and execution by him in January, 1865, of a deed for 36,450 acres of the land embraced in the deed of 1858, and his letter to John Herman, later in that year, in relation to his proposed sale of the remainder, are all utterly inconsistent with the execution and delivery of this deed.

(5) The acts and conduct of the alleged grantee and his descendants are also inconsistent with the valid delivery of this deed. Herman's actions in his lifetime were confined to those tracts of lands to which he had deed by metes and bounds. He never had these lands assessed to himself for taxes. It does not appear that he ever had possession of the deed, and the communication to him from M. Bouvier in 1865 negatives the idea that there had then been any delivery of such a deed to him, and he (Herman) died the next year. In 1894 or 1895, in the bill brought by Mary Ann Herman and Cornelia M. Herman against Jesse R. Irwin and others, the said plaintiffs only claimed 77/150 of the alleged excess of the Morris grants above the acreage found by the Harman survey, and made the Bouvier heirs parties, and upon the last page of said bill it affirmatively appears that at that date (1895) said Mary Ann Herman and Cornelia M. Herman made no claim whatever to the land in controversy in this suit, although said deed of November 10, 1858, had then been on record for 18 years, but claimed only their alleged proportion of the alleged excess of the two Morris grants over the six tracts laid off in 1853, and of which the 8,400-acre tract in controversy was one (though not conveyed).

(6) The only knowledge that is afforded as to the custody of the paper that was recorded in McDowell county in 1877 is afforded by a notation on the margin of the deed book in these words:

"This deed was mailed to S. S. Marsh, care H. T. Basford, P. O. Box 3476, New York, June 29/77."

[3] Efforts have been made to ascertain the further history of the paper, as well as to ascertain what, if any, relation either of these persons sustained toward either the grantors or grantee under this deed, but without effect; so that there is nothing to show that this paper, either before or since its recordation, has ever been in any proper cus-

tody. Under these circumstances it seems that the bare record of the paper can certainly have no more force than the original paper, unrecorded, but produced and relied upon, could have. And as to the weight which would be given to it, in Applegate v. Lexington, etc., Mining Co., 117 U. S. 255, 6 Sup. Ct. 742, 29 L. Ed. 892, Mr. Justice Woods, delivering the opinion of the court, says:

"The rule is that an ancient deed may be admitted in evidence without direct proof of its execution, if it appears to be of the age of at least 30 years, when it is found in some proper custody, and either possession under it is shown, or some other corroborative evidence of its authenticity, freeing it from all just ground of suspicion."

For the reasons herein indicated, a decree may be drawn in favor of the plaintiff, granting the relief prayed for in the bill.